1                    IN THE UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF CALIFORNIA
2


3      Pamela Denise Pringle,
              Plaintiff,
4
       vs.                                Sacramento, California
5                                         No. 2:18-cv-02035
       Brent Cardall, et al.,             Tue., Feb. 19, 2019
6            Defendants.                  1:33 p.m.
       _____/
7
                            TRANSCRIPT OF HEARING
8           BEFORE THE HONORABLE WILLIAM B. SHUBB, SENIOR JUDGE
                             ---oOo---
9


10     APPEARANCES:

11      For the Plaintiff:           Law Offices of Hans W. Herb
                                     P.O. Box 970
12                                   Santa Rosa, CA  95402
                                     By:  Hans W. Herb
13                                   Attorney at Law

14
        For the Defendants:         Office Of The Idaho Attorney
15                                   General
                                     PO Box 36
16                                   Boise, Idaho  83722
                                     By: Elisa S. Magnuson
17                                   Deputy Attorney General

18
        Official Court Reporter:    Kimberly M. Bennett,
19                                   CSR, RPR, RMR, CRR
                                     501 I Street
20                                   Sacramento, CA 95814

21


22     Proceedings recorded by mechanical stenography, transcript
       produced by computer-aided transcription
23


24


25

1              (Call to order of the court, 1:33 p.m.)

2              THE CLERK:  Item three, civil 18-2035 Pam Pringle

3    versus Brent Cardall, et al.

4        Counsel, your appearances please.

5              MR. HERB:  Good afternoon, Your Honor.  Hans Herb,

6    appearing on behalf of the plaintiff.

7              MS. MAGNUSON:  Good afternoon, Your Honor.  Elisa

8    Magnuson, appearing by phone for defendants.

9              THE COURT:  Ms. Magnuson, are you with the Idaho

10   Attorney General's office?

11             MS. MAGNUSON:  Yes, I am, Your Honor.

12             THE COURT:  All right.  Well, the two matters before

13   the Court are the motion to set aside the default and a motion

14   to quash service.

15       Mr. Herb, the Court is reluctant to enter a default against

16   the Attorney General of the State of Idaho.  How are you

17   prejudiced if the Court does not grant that request?

18             MR. HERB:  Well, let me answer it this way, Your

19   Honor:

20       First of all, the first premise for your question is part

21   of the concern I have too, is the suggestion that the Attorney

22   General can be a haven, in the manner that we allege that they

23   have, and just expect that this Court is going to regularly set

24   it aside because they feel like there is some bond or some

25   relationship.  And, frankly, I find that offensive.

1      But, second, from my client's perspective --

2          THE COURT:  Well, but let me add that part of Rule 4

3   relates to the inability of the plaintiff to take the default

4   of the United States.  And if you're going to take the default

5   of the United States, you can't just take a default, you have

6   to prove your case.

7      And I think there are similar considerations.  It's not

8   that this is an old boy's network between the Court and the

9   government, but it's that if you take the default against a

10  government, you're defaulting against the people.  And the

11  Court is reluctant to do that.  That's the basis of --

12          MR. HERB:  I understood, Your Honor.  But I think the

13  solution to that -- and I don't know, I mean, it's not --

14  someone is not going to give us a rubber stamp and tell us to

15  bring an armored car up here and take the money away.  My

16  client is going to have to prove her case.  And, I don't know,

17  maybe the Court, reviewing the papers, will not be convinced.

18          THE COURT:  But if that's the case, you're asking for

19  injunctive relief as well as damages, right?

20          MR. HERB:  That's correct, Your Honor.

21          THE COURT:  You're saying that you would still be

22  able to -- the Attorney General would still be able to defend

23  against your claim for injunctive relief?

24          MR. HERB:  I think the whole key to this, from my

25  perspective, Your Honor, is -- what's on trial here, from my

1  perspective, is whether I need to listen to you, or any other

2  citizen needs to listen to you.

3     If someone has something that they want to complain about

4  to you, by all means, Judge, they should come here, like every

5  other litigant, and talk to you about it.  And if you're

6  convinced, you should rule in their favor.  What they shouldn't

7  do is ignore your mandates.  They should not throw your papers

8  in the garbage.

9     I believe if you allow people, or encourage people, if you

10  tell people, hey, my rules don't matter, you can throw the

11  stuff away, and then come back and ask me and I'll set it

12  aside, I'm sorry, Your Honor, but I've been doing this 30

13  years, first time I've ever opposed a motion to set aside a

14  default because I can't imagine a more egregious case.  If this

15  can be set aside just by saying, well, hey, it's no big deal,

16  judge doesn't mind, then why even have a rule?

17              THE COURT:  So, go back to my question.  Is there

18  some harm to you or your clients --

19              MR. HERB:  There is ongoing harm to my client for a

20  couple of different reasons.

21     I realize just proving up my case is not sufficient to meet

22  the legal standard.  The fact that my client has already

23  provided all the paperwork, and provided all the information to

24  the magistrate judge, I understand that is not prejudice in the

25  classic sense.

1          However, my client, who is in this precarious situation --

2     the allegation of my client's claim, the real gravamen is, once

3     she filed a claim against the State of Idaho, they issued a

4     nationwide arrest warrant for her.  That's the trouble.  And

5     right now this is pending.  And having this hanging over her

6     head is putting her on a huge emotional roller coaster.

7          And, you know, she is prejudiced personally because she can

8     get no finality, she can get no ruling on her case.  And

9     they've been able to effectively push this out, inflict more

10    harm, inflict more punishment against her with, apparently, no

11    legal consequence.

12          THE COURT:  What happened to your first case against

13    the State of Idaho?

14          MR. HERB:  I was not involved in the -- part of the

15    first case, Your Honor.  When I came in at the end, what

16    happened was part of the case was transferred to Idaho.

17          THE COURT:  Yes, but if your client's concern is that

18    this is prolonging the litigation, why didn't you just go

19    forward with the case against Idaho after it was transferred?

20          MR. HERB:  That's a great question, Your Honor, and

21    I'm glad you're giving me an opportunity to explain that.

22          I'm not admitted in Idaho.  I happen to be admitted in

23    Washington.  I happen to be admitted in Arizona.  I happen to

24    be admitted in California.  But I'm not admitted in Idaho.

25          In fact, I don't know if Your Honor knew this, but when I

1    came in, just to dismiss that case and file this new case, they

2    wanted me to hire a lawyer in Idaho and waive in pro hac vice

3    to file a dismissal.  Thankfully, the federal district court

4    judge up there did not see the utility in that and removed that

5    impediment to dismissing the case.

6          THE COURT:  If the judge removed that impediment,

7    then all you'd have to do is get an order to appear pro hac

8    vice in Idaho, wouldn't you?

9          MR. HERB:  The trouble is, Your Honor, and this is --

10   it's hard to understand this unless you have a nationwide

11   arrest warrant out for you.  And, thankfully, at least as far

12   as I know, I don't, and I hope nobody else does.  If she goes

13   to Idaho, that's the end of everything.  That's where they want

14   her.  That's where they had her incarcerated.  That's where she

15   was locked up for a long time.  That's where she caused them a

16   lot of trouble.  That's where they control all the machinery.

17   If they can get her back there, she's done.

18       What she's hoping is she's saying, hey, these bad things

19   happened to me here, they manipulated the system here, they

20   manipulated the system where she was completely in compliance

21   with the California parole officials, but Idaho tinkered with

22   the system to have this nationwide warrant so they could take

23   her back, and once she becomes there, they're effectively

24   sentencing her back to solitaire.  That's what's going to

25   happen.

1          THE COURT:  All right.

2     Well, Ms. Magnuson, you've heard what Mr. Herb has just had

3     to say.  Why did you not respond to the summons in this matter?

4     You responded, apparently, to the summons in the first case.

5     That was dismissed.  Why didn't you respond to this one?

6          MS. MAGNUSON:  Because, Your Honor, honestly, when we

7     received the mailing from plaintiff, I did not understand that

8     that was meant to effectuate service.

9     What we received in the mail was a copy of a summons and a

10    severely reduced in size complaint.  And I, in all my years of

11    practice, have never received such a mailing to effectuate

12    service.  And so I just -- we really didn't understand that

13    that's what that was meant to do.

14    At the same time of that service taking place, the Idaho

15    case was either just ending, or it was just being dismissed.

16    And so we were of the idea that the case was going to proceed

17    in Idaho.  And then, I think at the very beginning is when the

18    order came through in the Idaho district court that that case

19    had been dismissed.  And then, come to find out, now you've got

20    this other filing that's proceeding in California.

21    I thought she wanted us, maybe, to possibly be on notice

22    that the second complaint was going to occur in California, but

23    I did not, in any manner, believe that that was meant to

24    effectuate service.  And so --

25          THE COURT:  Let me ask you this, because I don't know

1    the answer, what did the service look like on the first case

2    that you did appear in?

3              MS. MAGNUSON:  It was a normal mailing with normal

4    sized complaint.  It was a copy of what was actually filed with

5    the court.

6              THE COURT:  So, was the only difference in the size

7    of the printing?

8              MS. MAGNUSON:  I think -- it wasn't only in the size

9    of the printing.  I think at the time it was -- I'm trying to

10   think back.  It was over a year and a half ago.  I think she

11   actually effectuated personal service upon one of the

12   defendants.  And so, when that occurred, that is when we

13   determined, since service did occur as to one of the

14   defendants, that we would go ahead and file the response in the

15   first matter.

16       I think she did attempt service in a couple of different

17   manners that would not be acceptable or compliant with FRCP 4e;

18   however, as to one of them, it did comply.  And so then, you

19   know, instead of prolong the matter, we really just saw a

20   purpose, at that point, to try to get the matter transferred to

21   Idaho, because -- and that matter was -- the defendants were

22   all Idaho defendants.  There were -- there was no Yolo County

23   involved, there was no California defendants.

24       And so it just made sense, at that point, since I think

25   service did occur as to one of the defendants, to proceed, to

1    respond, and have that whole matter -- not just part of the

2    matter, the whole matter was transferred -- was left after the

3    motion to dismiss.  It was, I think, one cause of action that

4    was left, and that was transferred to Idaho.

5                THE COURT:  Wasn't the summons and the first page of

6    the complaint that you received in this case in full size?

7                MS. MAGNUSON:  Yes.  The summons was full size.

8                THE COURT:  And the first page of the complaint as

9    well?

10               MS. MAGNUSON:  I believe the first -- the first page

11   of the complaint, I believe that was full size as well.

12               THE COURT:  So, you're telling me if that had all

13   been in full size, you would have understood that you were

14   served?

15               MS. MAGNUSON:  No.  Even then, I don't know that

16   service was effectuated properly under FRCP 4e(1).

17               THE COURT:  Why not?

18               MS. MAGNUSON:  It wasn't clear as to whether -- when

19   I was able to download the complaint and look at it, the

20   complaint was also served in personal capacity and official

21   capacity.

22      If it's an official capacity complaint, most of the time

23   when we are sued as agents of the state, or employees of the

24   state, then it's pursuant to a different standard, not the

25   4e(1) standard, it's under the 4j(2) standard.  And then Idaho

1    statute and service laws would be implicated, and that requires

2    service upon both the Attorney General's office and also, then,

3    the agency that's at issue.

4              THE COURT:  But you didn't -- did you require that in

5    the first case?  Weren't you sued in your official capacity as

6    well in the first case?

7              MS. MAGNUSON:  I think it did occur as to one of the

8    defendants in that case.  And so --

9              THE COURT:  No.  No.  It didn't, unless there is more

10   to it than you're telling me.  Are you telling me that --

11             MS. MAGNUSON:  In that case she served, I think it

12   was, both, and also, same thing, individual capacity, official

13   capacity.  I think she did effectuate -- we determined that she

14   did effectuate service as to one of the defendants.

15             THE COURT:  But as to official capacity, even in that

16   case, did they -- did they effect service?  Send a copy to the

17   Attorney General and serve the Assistant Attorney General?

18             MS. MAGNUSON:  Well, the other standard in Idaho,

19   it's -- I think it's alternative under 4j(2), you can also send

20   it to the executive officer.  And I think she did effectuate

21   service as to the executive officer onto, I believe it was,

22   Sandy Jones, because Sandy Jones is the executive officer of

23   that office.

24             THE COURT:  Okay.  So you're saying they did that in

25   the first case and they did not do it in this case; is that

1   right?

2              MS. MAGNUSON:  I don't believe they did it in this

3   case.

4              THE COURT:  All right.

5       Mr. Herb, did you do that in this case?

6              MR. HERB:  I believe all of the service that was

7   provided is what's been provided to the Court.  I cannot speak

8   to the earlier case, Your Honor, because I was not counsel in

9   that case at the time.  I apologize for not knowing the answer.

10      I would like to address one aspect of the size argument, if

11  the Court would indulge me.

12             THE COURT:  Right.  But I also want you to address

13  this question:  Number one, are you suing them in their

14  official capacity?  And I think the answer to that is yes,

15  because you're asking for injunctive relief.  But did you make

16  any effort to serve them in their official capacity?

17             MR. HERB:  I think the capacities that we served them

18  in, we served the people in Yolo County here in their official

19  capacity.  I'm not sure, other than the service that was

20  provided, that it -- they were served with the summons and

21  complaint, I don't think it said official or nonofficial

22  capacity.

23             THE COURT:  But, you see, there is a different

24  process you have to go through according to both the federal

25  statute and the state statute in Idaho.

1          MR. HERB:  I disagree, slightly, with Your Honor.

2    Because I think if you're suing -- the way I read, I believe

3    it's j, says, if you're suing the state or the municipality or

4    the government, which is why we did that in Yolo County,

5    because we are suing the state, or whatever, in this other

6    version that we had the case, we were not suing the State of

7    Idaho, we were not suing any municipality or any government

8    agency.  We were --

9          THE COURT:  No, but I think the point is that at

10   least if not under the statute expressly, then under case law,

11   if you're suing them in their official capacity, then it's

12   deemed to be tantamount to a suit against the state, and you

13   have to go through the process of serving the state or the

14   municipality.

15         MR. HERB:  I do know that we had this discussion at

16   the time, Your Honor, and we satisfied ourself -- of course,

17   the Court might disagree with me, but we satisfied ourself that

18   the service was effective for the purpose, because that's why

19   we had specifically served the Yolo defendants in the manner we

20   served them.

21         THE COURT:  Well, if you served the Yolo defendants

22   in that manner, I'm surprised that you didn't take the next

23   step and serve the Idaho defendants in the same manner since

24   you wanted injunctive relief from both.

25         MR. HERB:  I agree.  But I think, Your Honor, if you

1    look at this from our perspective -- from my perspective, just

2    as an advocate on behalf of my client, obviously there is

3    Eleventh Amendment issues with regard to the State of Idaho

4    that would create substantial defenses in that capacity.

5        The intention --

6            THE COURT:  But you're still suing them in their

7    official capacity, so whatever the defenses are, they're still

8    there.

9            MR. HERB:  True.  But not -- it's not the same rule.

10   When you look at the rule j, the way I read that rule, Your

11   Honor, it doesn't talk about the situation when you're not

12   suing the government.

13       When you're suing the government, in the capacity that

14   we're suing the government, the way we understood we were suing

15   the government, we believe that the service was effective

16   pursuant to the language.

17       If I can just, Your Honor, to respond to the other issue

18   regarding the size of this.  And I know Your Honor has been a

19   judge for a long time, and I'm recalling a case once when legal

20   paper was outlawed in the federal courts.  The Court may recall

21   that.  United States Federal District Court Senior Judge Miles

22   Lord, in Minnesota, said, you know, when legal papers are

23   outlawed, only outlaws will have legal paper.

24           THE COURT:  Was that Lourdes Baird?  Or -- wasn't

25   that Lourdes Baird?

1             MR. HERB:  I think it was.  He was quite a colorful

2   character.

3             THE COURT:  No, this is a woman.

4             MR. HERB:  Different one, then.

5             THE COURT:  Okay.

6             MR. HERB:  My point is, Your Honor, I've really

7   ruminated with this idea of something, when you have that

8   exhibit there, or in front of the jury, and you blow up a

9   contract or a piece of paper, I don't think anyone says that's

10  not a true and correct copy of whatever it is.  I think that is

11  a true and correct copy.

12      When people come before the Court with a copy of a

13  legal-sized document, that's been reduced to eight and a half

14  by eleven, I don't believe that that's not a true and correct

15  copy.

16      So, regardless -- there is many things you can do if you

17  get something you don't understand.  You can call the

18  plaintiff's attorney; they have my phone number, they knew who

19  I was.  They could have looked on Pacer, which they admit they

20  did.  They could have filed a 12(e) motion, said, we can't

21  understand this, it's not understandable.  And there is other

22  things they could have done.  But what you're not supposed to

23  do when you get a summons, you're not supposed to throw it in

24  the garbage.

25      I think if the Court goes back to the history, remembering

1    back to law school, why the summons is so important, and I

2    personally put a lot of weight on this, even though it's been a

3    long time since I was in law school, I never forgot this, you

4    had a complaint, you brought it to the king or the chancellor,

5    that was the one, that was you, who issued the order that

6    commanded the citizen to come before the court.  That's your

7    order.  Whatever the complaint said, you issued an order.  And

8    the order was in writing.  And the order was given to them.

9    And it's not okay to ignore those orders.  It's not okay just

10   to say, I'm not going to show up.  And it's even more not okay

11   to come in and say, judge, you're going to let me off the hook,

12   aren't you?

13           THE COURT:  All right.  Now, even if the Court finds

14   that you effected service of the defendants in their individual

15   capacity, there is a serious question as to whether you

16   effected service in their official capacity.  And I think, as a

17   matter of fact, there may even be a circuit split on what is

18   required by way of service in order to accomplish service in

19   official capacity.

20       I'm going to ask Ms. Magnuson.

21       Mr. Herb has suggested that, at the very least, if the

22   Court grants your request to be relieved of your default, that

23   you be required to compensate him for the time spent in making

24   the motion to have the default judgment entered.  Don't you

25   think that's fair, under the circumstances?

1              MS. MAGNUSON:  No, I don't that's fair, Your Honor.

2              THE COURT:  Why not?

3              MS. MAGNUSON:  I don't think that's fair because --

4              THE COURT:  Because I'll tell you, because you didn't

5    do anything.  He makes a good point.  You didn't do anything.

6    There may be some serious questions about whether service was

7    proper, there may even be some questions having to do with the

8    size of the papers, but you didn't call him, you didn't make a

9    motion to clarify.

10             MS. MAGNUSON:  I did call him when I found out that

11   he was trying to default us.  And I explained to him, and I

12   tried to talk to him about voluntarily setting aside that

13   default, and we could not come to an agreement.

14      And I gave him until a date specific when I was going to

15   proceed with a set-aside motion.  And he was well aware of that

16   during this time, during the whole period, and proceeded to, I

17   think, prepare the default judgment package, regardless, to try

18   to maybe beat any set aside of entry of default because the

19   standard in regards to default judgment set aside is

20   probably -- or is greater than the set aside entry of default.

21      He was aware during that month that that was occurring, and

22   that we were imminently going to file a motion to set aside

23   default.

24      I would have liked --

25             THE COURT:  I think he beat you by one day.

1          So, are you telling me it was a full month --

2          MS. MAGNUSON:  Yes.

3          THE COURT:  -- that you were having discussions, and

4    he knew that you were going to ask the Court to set it aside?

5          MS. MAGNUSON:  Yes.

6          THE COURT:  Let me ask you, Mr. Herb, is that right?

7          MR. HERB:  No, Your Honor.  It's not.

8          THE COURT:  Tell me your side of the story.

9          MR. HERB:  My version of the story -- and, of course,

10   anything of this should be in the evidence before the Court,

11   Your Honor.  What happened was the default was taken in the

12   normal course.  We waited a period of time.  You'll notice it

13   wasn't immediate, that when the answer was done --

14         THE COURT:  Right.  I think we actually had some

15   meeting where I said, are you going to take a default or not.

16         MR. HERB:  You did, Your Honor.  And we had a hearing

17   about this.  And Mr. Whiteside was the one.  I think, perhaps,

18   counsel may be confused with her discussions with

19   Mr. Whiteside.  I didn't learn about any conversations about

20   the default, except through Mr. Whiteside, until after the

21   default had been entered.

22         THE COURT:  When did she first talk to you about her

23   intentions to move to set aside the default?

24         MR. HERB:  I think, as the Court noted, it was just a

25   day or two before, around the same time that she indicated -- I

1   believe it was on a Friday we had a discussion.  I talked to

2   Mr. Whiteside, I think, in the meantime, and then on the

3   following Monday, I believe, I could be wrong, but something

4   like that, we both filed the same day or close days.

5           THE COURT:  So, this chronology is relevant to me in

6   making a decision as to whether to require the defendant to

7   compensate the plaintiff if I set aside the default.

8       Do you have any documentation, any e-mails or anything,

9   that would establish the time that you had these discussions

10  with Mr. Herb?

11          MS. MAGNUSON:  Yes, I have copies of e-mails, Your

12  Honor, that establish my time period.

13      So, just to be clear, the entry -- the clerk entry default

14  was entered on November 19, 2018.  I discovered the entry of

15  default on December 5, 2018.  On December -- I believe that

16  Friday, it was probably the 7th or the 8th, I have to look at

17  the calendar because I don't have it in front of me right now,

18  but the 7th or 8th, that Friday, I did have a discussion where

19  I called Mr. Herb up to say, I understand that you have entry

20  of default against my clients and myself, and I would like to

21  discuss voluntarily setting that aside.  I gave him, I think,

22  about a week to maybe ten-day period to do so.  And, if not,

23  then I said we were going to proceed with motion for entry to

24  set aside default.

25      I have that in e-mail.  If you want that forwarded to you,

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1   I will gladly forward that to you.

2            THE COURT:  I would like to see that.  You referenced

3   a phone call, but you also have an e-mail, correct?

4            MS. MAGNUSON:  Yes.

5            THE COURT:  All right.  So, here is the Court's

6   present intention:  I would intend to grant the motion to set

7   aside the default.  And I will take under submission the

8   question of whether to require the defendants to indemnify the

9   plaintiff for the time spent to make the motion for default

10  judgment until after I see whatever additional materials

11  Ms. Magnuson is going to present, and any additional written

12  documentation that Mr. Herb might have to present relating to

13  the communications between them during that period of time.

14      Now, the next --

15           MS. MAGNUSON:  I was going to say, it might contain

16  some settlement discussions, quote, unquote, so I would redact

17  that portion of it, if that's the case.

18           THE COURT:  All right.

19           MS. MAGNUSON:  And only include the discussion about

20  the default.

21           THE COURT:  All right.  That's satisfactory.

22      Now I want to talk about the motion to quash service of the

23  summons.  It involves some of the same questions we've been

24  talking about.  It's the flip side of the question as to

25  whether to enter judgment on the default.

1          How do you think you should be -- your client should be

2     served, Ms. Magnuson?

3          MS. MAGNUSON:  If we are being sued in our official

4     capacities, then I believe that Federal Rule of Civil Procedure

5     4j(2), which then would mean that the Idaho Rule of Civil

6     Procedure 4(d)(4) would have to be complied with.

7          THE COURT:  Okay.  And that would be sending two

8     copies by mail.  Does it have to be certified mail?

9          MS. MAGNUSON:  They could send it certified mail.

10          THE COURT:  Do they have to?

11          MS. MAGNUSON:  Yes, I believe that's a requirement.

12          THE COURT:  Well, what I'm asking you about is

13     exactly what Mr. Herb has to do.  Because my inclination here

14     is to hold off on this motion to give the plaintiff an

15     opportunity to serve the defendants in precisely the way you

16     think they ought to be served.  And if he accomplishes that,

17     then I would deny the motion to quash.

18          MS. MAGNUSON:  Understood, Your Honor.

19          THE COURT:  So, Idaho Rule 4(d)(4) -- let's see, I

20     think I have it here.

21          MS. MAGNUSON:  I think I have it here, too.

22          THE COURT:  Deliver two copies of the summons and

23     complaint to the Attorney General or Assistant Attorney

24     General.  Is that all?

25          MS. MAGNUSON:  Let's see --

1          THE COURT:  You're the Assistant Attorney General --

2     are you the Assistant Attorney General?

3          MS. MAGNUSON:  I'm not the Assistant Attorney

4     General, I'm the Deputy Attorney General.  But he could address

5     it to the Attorney General, and that would suffice.

6          THE COURT:  Okay.  Does it -- are you -- do you know

7     whether it has to be certified?

8       I don't see that in the rule, but if you're to compare that

9     to the federal practice, I think it's usually certified mail.

10          MS. MAGNUSON:  Yeah.  And I believe it's certified

11     mail as well, Your Honor.

12          THE COURT:  Okay.  So, if he sends two copies, by

13     certified mail, of the summons and complaint, addressed to the

14     Attorney General, and he makes every page full size, would that

15     effectively accomplish service?

16          MS. MAGNUSON:  Yes, Your Honor.

17          THE COURT:  So, that's in their official capacity.

18       How does he effectively accomplish service on the

19     individual defendants in their individual capacity?

20          MS. MAGNUSON:  I think that in their individual

21     capacity he would either -- A, you can personally serve them,

22     or, B, you can serve them at an address that they're authorized

23     to receive mail at in their individual capacity.

24       In this instance, there was no attempt to do that, so

25     that's why I don't believe that individual service has occurred

KIMBERLY BENNETT, OFFICIAL COURT REPORTER, USDC -- (916) 442-8420

1    as to any --

2              THE COURT:  All right.  We can --

3              MS. MAGNUSON:  I'm not even sure if that's what their

4    suit is encapsulated with.  I don't know whether they are suing

5    the individuals or whether it's their purpose of just suing the

6    state and --

7              THE COURT:  No.  No.  It's clear to me from reading

8    the complaint that they're suing the defendants in their -- in

9    their official capacity, insofar as they're asking for

10   injunctive relief, and in their individual capacity, insofar as

11   they're asking for money damages.  That's clear.

12      So, how does the plaintiff accomplish service on the

13   individual defendants in their individual capacity?

14             MS. MAGNUSON:  So, then, I would believe that under

15   4e(1), it's under the law where the district court is located.

16   So, that's California rules.  California rules allow for

17   out-of-state service that must substantially comply or -- I

18   think on the court of appeals they said it must strictly comply

19   with, what is it, CCP 417.2 in regards to service, and their

20   proof of service in regards to an out-of-state defendant, that

21   there is either evidence satisfactory to the court to establish

22   actual delivery to the person to be served, or other evidence

23   showing that it was received by someone that's authorized to

24   receive it on behalf of that person.

25             THE COURT:  So, is there somebody authorized to

1   receive it on behalf of those individual defendants?

2           MS. MAGNUSON:  I think those individual defendants

3   would be authorized to receive it.  And if they haven't

4   appointed anyone that's authorized to receive it on their

5   behalf, then, you know, you need to serve, I think, the person.

6           THE COURT:  Okay.  My experience in the practical

7   world, at least here in California, is that the Attorney

8   General does not usually want to encourage process servers to

9   go out and hang around police officers' homes in order to

10  effect personal service on them.

11     If you're saying that's what's required, I'd like to know

12  that right now, before we invite the plaintiff to do just that.

13          MS. MAGNUSON:  I'm not saying that's required,

14  because in that instance the police officers probably have

15  authorized their employers to accept service on their behalf.

16          THE COURT:  Wait a minute.  You represent their

17  employer, so you can tell me right now whether the police

18  officers have authorized their employer to accept service on

19  their behalf or not.

20          MS. MAGNUSON:  I think police officers are in a

21  different capacity, though, because police officers, there is a

22  safety component to that, they do authorize their employer.

23  And their employer isn't the -- I don't believe it's the

24  Department of Corrections, I think the police officer even

25  are -- it's the locality of where they're at.

1          THE COURT:  Okay.  I used police officer in a broad

2     term.  What about these defendants?

3          MS. MAGNUSON:  Well, in this circumstance, in this

4     case, to effectuate service, moving forward, I can accept

5     service in this -- in this capacity right now.  If -- in this

6     lawsuit, for them to effectuate service, they could serve these

7     persons, and I -- on -- to me, and I can accept on their

8     behalf.

9          THE COURT:  All right.  So, in their individual

10    capacity, Mr. Herb could effect service on the defendants by

11    mailing you a copy of the summons and complaint; is that what

12    you're saying?

13         MS. MAGNUSON:  In this -- yes.  I would -- I would,

14    for the limited purposes of this case, authorize that.

15         THE COURT:  All right.

16         MS. MAGNUSON:  In the midst of it.

17         THE COURT:  All right.  So, that's how we're going to

18    resolve the motion to quash.

19       And how much time would you need to accomplish service both

20    in their individual and official capacities as Ms. Magnuson has

21    described it here, Mr. Herb?

22         MR. HERB:  I think, Your Honor, we'll do it

23    forthwith.  Within the next week, we'll send them out.  And

24    then whatever time limits would apply.  I know by mail there is

25    added ten days.

1          THE COURT:  I'll give you -- do you want 14 days all

2     together?

3          MR. HERB:  That would be excellent, Your Honor.

4          THE COURT:  All right.  That will be part of the

5     order, that the motion to quash will be denied upon the

6     condition that the plaintiff effect service, as has been

7     described here, within 14 days.

8          MR. HERB:  Your Honor, there is one other thing.  I

9     don't know if Your Honor was done, I don't want to interrupt

10    you, but there is one other thing about the defendants that

11    appeared without being admitted to the court.

12       There is a local rule that applies in that case to

13    attorneys appearing in this court that are not admitted or

14    licensed to practice here.

15       Is there any consequence to that?

16          THE COURT:  Well, they probably ought to take heed

17    with what you said and make sure that they get admitted pro hac

18    vice.  It only involves paying a fee and making the motion.

19       It really doesn't affect your client one way or the other,

20    does it?  Doesn't help your client whether the court collects a

21    fee from the Idaho Attorney General or not.

22          MR. HERB:  It does in one way, Your Honor, because --

23    and I'll just be frank.  I'm trying to convince you that

24    certain people might be scofflaws, that they don't like to

25    follow the law, and they don't like to follow the laws in

1   California.  And I think I want them to know, and I think this

2   Court should know, if the Court makes a rule, you're expected

3   to comply with the court rule.

4           THE COURT:  All right.  That's fair.

5       Would you like to make a motion, or have somebody on your

6   behalf make the motion, to appear pro hac vice?

7           MS. MAGNUSON:  Your Honor, Your Honor, this is Elisa

8   Magnuson --

9           THE COURT:  It's still Elisa Magnuson.  All right.

10          MS. MAGNUSON:  I am authorized to practice in

11  California.  And, if need be, to take the Attorney General off

12  the pleadings, because he's on the pleadings but he's not

13  signing the paperwork.  We can do that.  Or we can pro hac vice

14  in, either way.

15          THE COURT:  You don't -- it's nice that you're

16  admitted to practice in California, but you still have to be

17  admitted to practice in this court.  It just requires a small

18  fee, and you'll be welcomed, and we'll send you a certificate

19  if you do that.

20          MS. MAGNUSON:  I am authorized to practice in your

21  court.

22          THE COURT:  Oh, you are admitted to practice.  Well,

23  there you are.

24          MS. MAGNUSON:  I'm admitted to practice in the

25  federal district of -- all California districts in the federal

1   courts.

2            THE COURT:  Are you admitted to practice in the

3   Eastern District of California?  You're on our roles?

4            MS. MAGNUSON:  Yes, Your Honor.

5            MR. HERB:  But the other two attorneys that are on

6   the pleadings are not admitted to practice in either

7   California --

8            MS. MAGNUSON:  They're not signing the pleadings.

9            THE COURT:  Okay.  Well, I think this is solved,

10  then, Mr. Herb.  Don't worry about it.  Worry about your

11  client, don't worry about the Idaho Attorney General.

12           MR. HERB:  Very well, Your Honor.

13           THE COURT:  All right.  Have we covered everything?

14           MS. MAGNUSON:  Your Honor?

15           THE COURT:  Yes.

16           MS. MAGNUSON:  One more thing.

17       If you are going to order, or if you're considering having

18  payment in regards to the preparation of the default judgment

19  package, then are you going to also submit -- or have the

20  plaintiff submit the hours put in versus the hours for the

21  attorney hours versus his client's hours --

22           THE COURT:  Oh, yes.

23           MS. MAGNUSON:  -- and who is drafting the

24  documentation?

25           THE COURT:  Oh, yes.  Whenever the Court grants

1  attorneys' fees, that is part of the information required.

2          MS. MAGNUSON:  And I still highly object to that,

3  because I don't think that it's a proper use of jurisprudence

4  in this matter, because I don't believe that it was warranted.

5  I do think it was a calculated filing by them in order to try

6  to get a default judgment granted.

7      However, if the Court finds that reasonable, I would like

8  to be apprised of that as well --

9          THE COURT:  Yes.

10          MS. MAGNUSON:  -- to be able to --

11          THE COURT:  Yes.  If you convince me that you used

12  due diligence in notifying Mr. Herb of your intention to move

13  aside the default, and that he went ahead anyway, then I

14  probably will not allow him the attorneys' fees.

15      But if after I review what you submit, and he submits, I

16  make the converse determination, then he'll be required to set

17  forth the hours he spent, his hourly rate, and both sides will

18  be heard before I determine the amount of the attorneys' fees.

19          MS. MAGNUSON:  Thank you.

20          THE COURT:  All right.  Thank you.

21          MR. HERB:  Thank you very much, Your Honor.  I

22  appreciate the opportunity for the argument.

23          THE COURT:  All right.

24              (Proceedings adjourned, 2:08 p.m.)

25                      ---oOo---

1    I certify that the foregoing is a correct transcript from the

2    record of proceedings in the above-entitled matter.

3

4                              /s/ Kimberly M. Bennett
                               KIMBERLY M. BENNETT
5                              CSR No. 8953, RPR, CRR, RMR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25